[No. 10323. Department Two. July 10, 1912.]

KATIE HENNELLY, *Appellant*, v. BISHOP EDWARD J. O'DEA, *as Executor etc., Respondent.*[1]

WORK AND LABOR—CONTRACTS—EVIDENCE—SUFFICIENCY. A claim that plaintiff's deceased uncle had agreed to give her the house and lot on which he lived, worth $20,000, in consideration of her coming west and keeping house for him, she to have no salary or other compensation, is not sustained by the evidence, where it appears that the deceased's letters making such an offer were not acted upon for three years, that meanwhile he made a will disposing of the property, that plaintiff came west when she was not expected by him about a month before his death, and that she did not contest the will, but filed a claim against his estate for her expenses in coming west and for services in attendance upon the deceased, amounting to $470, which was allowed.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered February 21, 1912, dismissing an action to quiet title, after a trial on the merits to the court. Affirmed.

[1]Reported in 124 Pac. 1123.

*George Friend, C. A. Riddle,* and *Million & Houser,* for appellant.

*Farrell, Kane & Stratton,* for respondent.

Mount, J.—The plaintiff brought this action to quiet title to two lots in the city of Seattle. Upon a trial of the case to the court without a jury, the complaint was dismissed, and title quieted in the defendant as executor. The plaintiff has appealed.

The plaintiff bases her claim to the property upon an alleged promise made by John W. Manley during his lifetime that, if the plaintiff would come from the state of New York to Seattle and care for him during his lifetime, he would pay her no wages but would give her the property in question; that, upon this request, she came from New York to Seattle, where she arrived about the 1st of September, 1908, and cared for Mr. Manley until his death upon October 9, following. It appears from the evidence that John W. Manley came from Ireland to this country about forty years prior to his death. He had lived in Seattle for the last thirty years, and at the time of his death was about eighty years of age. He was a bachelor and a devoted member of the Catholic church. He accumulated considerable property, among which were the lots in dispute, valued at about $20,000. He lived upon these lots in a small hut. Early in the year 1907, he became ill and went to the Providence Hospital for treatment. While there, on February 13, 1907, he made a will by which he bequeathed his property to certain charitable uses and to certain relatives, making stated bequests to each. The will named Bishop Edward John O'Dea as executor. After making this will, Mr. Manley recovered from his illness and returned to his home, where he remained until his death.

The plaintiff is a grandniece of Mr. Manley. She came to Seattle on Monday, September 7, 1908. When she came, Mr. Manley was not expecting her, and had no place for her

to stay.  He took her to a neighbor's house, where she lived
for about a week, and then she went to Mr. Manley's house
and cared for him about four weeks, or until his death on
October 9.   After Mr. Manley's death, the plaintiff lived
with a neighbor for about a month, and during that time
she had the house repaired and subsequently lived there.
Later the will above mentioned was admitted to probate, and
Bishop O'Dea was appointed executor.   The will was con-
tested by certain relatives, but the contest apparently failed.
The plaintiff was not one of the contestants.   On September
18, 1909, nearly a year after Mr. Manley's death, the plain-
tiff filed a claim for $470 against the estate; $350 of this
claim was for expenses in coming from New York to Seattle
and return to Ireland; $20 was for money loaned to deceased;
and $100 was for "attendance upon said deceased and house-
work for four weeks prior to the death of deceased, at the
rate of $25 per week."   This claim was approved by the
executor on October 13, 1909.   Thereafter, on June 25,
1910, this action was begun.   Upon the trial of the case, the
plaintiff testified that, some two or three years before she
came out to Seattle, she had received three letters from Mr.
Manley, while she was residing with relatives in the state of
New York; that when she was getting ready to come out
here, she destroyed these letters.   These relatives testified
that they had seen the letters from Mr. Manley to the plain-
tiff, and that the letters read about as follows:

"Dear Katie:  I would like if you would come out and take
care of me and I will give you this house that I am living in
and you give up your position in New York and come out
with me.  I wont pay you any salary."

This testimony was admitted over the objection of the de-
fendant, but when the court came to consider the evidence, the
judge was of the opinion that it was inadmissible, under Rem.
& Bal. Code, § 1211, which provides that a party in interest
or to the record shall not be permitted to testify in his own
behalf as to any transaction had by him with the deceased

person. The court was of opinion that the receipt of the letters was a transaction had by the plaintiff with the deceased, and for that reason declined to consider the evidence. The plaintiff's brother, who had lived with Mr. Manley for about two years prior to the time the plaintiff came to Seattle, testified that, after his sister came to Mr. Manley's place, he heard Mr. Manley say to plaintiff: "Katie, this will be your place if you will take care of me until my death. But, remember, there is no salary coming to you." The trial court gave little or no credence to this testimony.

It is argued by the appellant that the court erred in refusing to consider the evidence relating to the letters. The greater part of the argument in the briefs is devoted to this question. We deem it unnecessary to decide this question in this case; because, if we should conclude that all of the testimony offered in regard to the letters is proper, we are still of the opinion that the evidence preponderates against the plaintiff's contention that the deceased gave, or intended to give, the property to her. The letters upon which plaintiff bases her claim were written, if written at all, two or three years prior to the time she finally came to Seattle; and if Mr. Manley in his lifetime had desired her to come and care for him, he had abandoned all hope that she would come, and in the meantime had made a will and devised his property. There is credible evidence to the effect that, when the plaintiff came to Seattle, she came without notice to the deceased. He was entirely unprepared for her. He took her to a neighbor's where she stayed for a week or more, and there stated that she had come out here to see her brother and the country. She did not then claim that she had come for the purpose of caring for Mr. Manley. After Mr. Manley's death, she made no claim to the property for nearly a year; and prior to her claim to the property, others had contested the will, and then she filed a verified claim against the estate for a salary of $25 per week for attendance upon the deceased and for household work prior to his death. This

claim for a salary directly contradicted the provisions of the contract which she is now seeking to enforce; because that contract, if made, provided that she should have no salary.

It also appears that Mr. Manley, prior to his death, was of the opinion that an attempt would be made to divert his property in a manner other than his will directed; for on August 31, 1908, about a month prior to the time when plaintiff came to Seattle, and about two months prior to his death, Mr. Manley wrote a letter to a priest living near his old home in Ireland, in which the deceased said:

"Eighteen months ago I had a cold they call la grippe. I went to the hospital. I had some business that meant to have done and I sent for the lawyer that used to do my business. My nephew was here at the time. He that was over there some years ago. This lawyer took my nephew up to his and made a great inquiry about all my relatives and he got freely. Now this was to break or try to break my will, for I a will made. This could give notice to all these people they would of course appoint him their counsel and agent and he would get all of my savings. Now, father, by a mere chance I have learned of this a few days ago. Had my nephew told me of the blunder he made I would be guarded against any such attempt to meddle with my affairs. Now I wish you to keep this letter and other of my letters that you think would be of importance to my interests. Now I do protest and deny to any person or persons a right or privilege to meddle in my affairs, I know my own business. I may make another will or maybe later a deed to the church of Seattle. I wish you to be careful of my letters. I am not feeling well. I am grieved and heartbroken this blunder after blunder. I have no one that I could rely on."

These and other facts and circumstances tend very strongly to discredit the testimony of the plaintiff's brother, and to show that the claim now made by the plaintiff is not made in good faith. The trial judge was of this opinion also, for in deciding the case he said:

"When we take into consideration also the fact that the plaintiff destroyed letters which she claimed to have received from the deceased upon the eve of her departure from New

York to accept the offer contained in these letters; that she resided with Mrs. Ford for about ten days upon arrival here and never made mention of the fact that she had come out here to take care of her uncle; that she told Mrs. Ford that she was going down to keep house for her brother at Eighth avenue and Pike street; that on Manley's death she and her brother turned all the papers and effects over to defendant in this case as executor; that she made no claim to the property until eleven months after his death and then only because a contest was being waged against the will, and thereupon she filed a claim against the estate for services amounting to $470, we are forced to conclude that the plaintiff has not sustained her cause of action with that degree of evidence which the law requires."

Upon all the facts in the case, we think the conclusion reached by the trial court was right. The judgment is therefore affirmed.

FULLERTON, ELLIS, MORRIS, and GOSE, JJ., concur.